# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 1537 | **DATE** | 12/21/2004 |
| **CASE TITLE** | David McIntyre vs. Household Banks | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due _____.

(3)  ☐  Answer brief to motion due_____. Reply to answer brief due_____.

(4)  ☐  Ruling/Hearing on _____ set for _____ at _____.

(5)  ■  Status hearing set for 1/5/2005 at 10:00 A.M..

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐  Trial[set for/re-set for] on _____ at _____.

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
      ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10)  ■  [Other docket entry]  Plaintiff's Motion for Class Certification [37-1] is denied. Defendant's Motion for Summary Judgment [47-1] is granted in part and denied in part. The clerk is directed, pursuant to F.R.Civ.P 54(b) to enter partial judgment in favor of defendant Household Bank and against plaintiff David McIntyre. Enter Memorandum Opinion and Order.

(11)  ■  [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | DEC 2 2 2004 |
| ✓ | Docketing to mail notices. | docketing deputy initials |
| ✓ | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | date mailed notice |

| SRB | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials |
|---|---|---|---|

**Document Number**

68

DAVID MCINTYRE, )
)
Plaintiff, )
)
v. ) No. 02 C 1537
)
HOUSEHOLD BANK, ) Judge Ruben Castillo
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiff David McIntyre brought this class action lawsuit against Defendant Household

Bank ("H.B.") alleging that certain H.B. credit card lending practices violate federal and state

law. McIntyre contends that after he applied for a credit card, H.B. opened an account in his

name without giving him proper disclosures, charged an annual fee to the account, and never sent

him any statements notifying him of the pending charge. McIntyre has brought claims under the

Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA") and the Illinois Consumer Fraud and

Deceptive Business Practices Act, 815 I.L.C.S. 505/1, *et seq.* ("Illinois Consumer Fraud Act"), as

well as a common law claim for unjust enrichment. (R. 34, Am. Compl. ¶¶ 35-50.) Presently

before the Court are McIntyre's Motion for Class Certification, (R. 37-1), and H.B.'s Motion for

Summary Judgment, (R. 47-1). Because H.B. filed its motion for summary judgment before

McIntyre's motion for class certification was fully briefed, and because the parties agreed in open

court to proceeding in this manner, we will address these motions contemporaneously.[1]

---

[1]We note that while it is unusual for the Court to proceed with a decision on the merits at
the same time we decide a motion for class certification, the Seventh Circuit has held that where
a class certification decision becomes practical only after a case is already ripe for summary
judgment, we may properly consider a summary judgment motion even prior to considering the

(continued...)

# RELEVANT FACTS[2]

## A.     Background

H.B. is a national bank that provides consumer credit card services. (R. 58, Pl.'s Resp. to Def.'s Facts ¶ 2.) H.B. is chartered pursuant to the National Bank Act and its sole organizational address is located in Nevada. (*Id.*) H.B. has no branches outside the state of Nevada. (R. 67, Def.'s Resp. to Pl.'s Add'l Facts ¶ 2.) H.B.'s parent, Household International, Inc., is located in Illinois, but does not issue credit cards or engage in other lending activities. (*Id.*) McIntyre is a resident of Alabama. (*Id.* ¶1.)

## B.     McIntyre's Credit Card Application

Sometime prior to February 10, 2000, H.B. mailed printed materials to McIntyre at his home address on Jefferson Avenue, in Bessemer, Alabama ("Jefferson Avenue Address"). (*Id.*; R. 59, Pl.'s Exs., Ex. C, McIntyre Dep. at 72:7-16.) These materials stated that McIntyre had been pre-approved for a credit card account and solicited his application for a credit card. (R. 58, Pl.'s Resp. to Def.'s Facts ¶ 3.) The printed materials included a solicitation letter, a statement entitled "Solicitation Disclosures," and a statement entitled "Initial Disclosure Statement." (*Id.* ¶ 4.) Each of these documents made reference to the $79 annual fee associated with the credit card account. (*Id.* ¶¶ 5-7.) Specifically, the solicitation letter stated that "An annual fee of $79 will be

---

[1](...continued)
class certification issue. *Chavez v. Ill. State Police*, 251 F.3d 612, 630 (7th Cir. 2001).

[2]This section sets forth the facts as presented in the parties' Local Rule 56.1 statements of material facts filed with their summary judgment briefs. When ruling on the motion for class certification, we will consider only the facts set forth in McIntyre's first amended complaint and the evidence presented in the briefing on class certification. The "Legal Standards" sections herein set forth the levels of scrutiny that we apply to the facts for each ruling.

conveniently charged to your new MasterCard and will appear on your first statement." (*Id.* ¶ 7.)
The Initial Disclosure Statement stated that "an Annual Fee of $79 will be charged to your
account on the date the Account is opened and annually thereafter." (*Id.* ¶ 5.) The Initial
Disclosure Statement also explained when H.B. imposes a finance charge, how it calculates that
charge, and that annual fees are included in the balance on which finance charges are calculated.
(*Id.* ¶ 29.) Specifically, the Initial Disclosure Statement stated that "each day [H.B.] add[s] any
Purchase Advance, Other Charges . . . and fees as of the transaction date[.]" (*Id.* ¶ 30.)

On February 10, 2000 McIntyre completed the application, signed a statement
acknowledging that he had "reviewed the disclosures provided on the reverse side and on the
enclosures," and mailed the application to H.B. along with a $19 processing fee. (*Id.* ¶¶ 8-11; R.
59, Pl.'s Exs., Ex. C, McIntyre Dep. at 72:7-16.) His signed application listed the Jefferson
Address as McIntyre's address. (*Id.* ¶ 9.) H.B. accepted McIntyre's application, charged a $79
annual fee to his account, and sent him a credit card and Cardholder Agreement.[3] (*Id.* ¶ 12.) The
Cardholder Agreement stated that "[t]he terms and conditions of the Agreement become effective
as of the first use of the Card or Account." (*Id.* ¶ 14.) With respect to the annual fee, the
Cardholder Agreement stated: "Your annual fee is $79 per year. The initial Annual Fee is
nonrefundable after the first transaction, and any renewal Annual Fee is nonrefundable after 30
days from the mailing date of the monthly statement on which the renewal annual fee is billed."
(R. 59, Pl.'s Exs., Ex. E, Cardholder Agreement.) When he received the credit card, McIntyre
put it in his desk and neither activated the card nor used it to make any purchases. (R. 58, Pl.'s

---

[3]Though McIntyre recalls receiving the credit card, his memory regarding the Cardholder
Agreement is fuzzy. He testified that he thought that the Cardholder Agreement was included
with the credit card in booklet form, but "he could not be absolutely sure." (*Id.* ¶ 13.)

Resp. to Def.'s Facts ¶¶ 15-16.) McIntyre did not contact H.B. to instruct it to cancel the account. (*Id.* ¶ 17.)

## C.  McIntyre's Account

H.B. states that it generated seven periodic statements on McIntyre's account for each month from March 2000 until September 2000. (R. 48, Def.'s Facts ¶ 20.) H.B. has attached copies of those seven statements as exhibits to its Local Rule 56.1 statement of material facts. (*Id.*, Ex. 1D, Periodic Statements.) H.B.'s regular business practice is to mail periodic statements, through an independent third party, to cardholders with a balance on their account to the address listed on their application.[4]  (R. 58, Pl.'s Resp. to Def.'s Facts ¶¶ 18-19, 21.) McIntyre never notified H.B. of any change of address, nor do H.B.'s records reflect that any of the statements were returned to H.B. as undeliverable. (R. 58, Pl.'s Resp. to Def.'s Facts ¶¶ 22-23.) McIntyre did not experience any problems receiving mail at the Jefferson Address during

_____

[4]For the purposes of our summary judgment ruling, we have deemed the facts in this sentence to be admitted because McIntyre has brought forth no evidence to dispute the evidence submitted by H.B. in support of these facts. This Court has explained in detail what we expect from summary judgment practitioners under Local Rule 56.1. *See Malec v. Sanford*, 191 F.R.D. 581, 582-587 (N.D. Ill. 2000). Specifically, "a general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial . . . a nonmovant's failure to adhere to these requirements is equivalent to admitting the movant's case." *Id.* at 584. McIntyre's denial of H.B.'s description of its regular business practice regarding the mailing of periodic statements is improper because he attempts to rebut the evidence of general practice with McIntyre's testimony that he personally did not receive periodic statements. That assertion is non-responsive to the evidence of H.B.'s regular business practices. Nor will we strike H.B.'s statements because they are supported by a sworn declaration rather than another documentary form; affidavits and sworn declarations based on personal knowledge are permissible forms of evidence to support a Local Rule 56.1 statement of facts. *Id.* at 584-85; 28 U.S.C. § 1746. The Group Director of Operations Strategy for Household Credit Services, Inc.—Jean Muenchau—swore in her declaration, under penalty of perjury, that she had personal knowledge of H.B.'s business and legal affairs sufficient to provide evidence of H.B.'s regular mailing practices. (R. 48, Def.'s Facts, Ex. 1, Muenchau Decl. ¶ 2; *Id.*, Ex. 3, Muenchau Decl. ¶ 2.)

the relevant time period. (*Id.* ¶¶ 22, 24.) McIntyre denies, however, that he ever received any of the statements notifying him of the outstanding balance. (*Id.* ¶ 18 & Add'l Facts ¶ 13.)

H.B. also states that it sent McIntyre a delinquency letter on April 15, 2000 notifying him that he had failed to make a required payment on his credit card account. (R. 48, Def.'s Facts ¶ 25.) H.B. submitted copies of its electronic records indicating that this letter was sent to McIntyre at the Jefferson Address on or about April 15, 2000. (*Id.*, Ex. 3, Muenchau Decl. ¶ 12; *Id.*, Ex. 1(E-F).) McIntyre refutes this evidence with his deposition testimony that he "did not even realize that there was anything pertaining to H.B. until" he received a letter from a collection agency sometime in February or March 2001 attempting to collect the $263 balance on his account. (R. 58, Pl.'s Resp. to Def.'s Facts ¶ 25; R. 59, Pl.'s Exs., Ex. C, McIntyre Dep. at 106; R. 67, Def.'s Resp. to Pl.'s Add'l Facts ¶ 14.) That collection agency's letter is dated February 21, 2001, but McIntyre does not remember the date on which he received the letter.[5] (R. 58, Pl.'s Resp. to Def.'s Facts ¶ 26.)

After he received the collection agency's letter, McIntyre found the unused H.B. credit card in his desk. (R. 67, Def.'s Resp. to Pl.'s Add'l Facts ¶ 16.) He then called the collection agency and told it that the letter must have been sent erroneously because he never used the card or account. (*Id.* ¶ 18.) The collection agency told him to contact H.B., which McIntyre did, and H.B. confirmed that McIntyre had never activated or used the card. (*Id.* ¶ 19.) After he was unable to resolve the matter to his satisfaction with either the collection agency or H.B., (*Id.* ¶

---

[5]Although H.B.'s Local Rule 56.1 statement of facts asserts that McIntyre received the collection agency's letter "a week" before March 6, 2001, the cited record evidence does not support that assertion. (R. 48, Def.'s Facts ¶ 28.) As a result, we will not consider that statement. *Malec,* 191 F.R.D. at 583.

20), McIntyre met with a lawyer on March 6, 2001 to discuss the matter, (R. 58, Pl.'s Resp. to Def.'s Facts ¶ 28). McIntyre filed a complaint in this Court on March 1, 2002. (R. 1, Compl.) McIntyre never paid H.B. or the collection agency for the balance on the credit card account. (R. 58, Pl.'s Resp. to Def.'s Facts ¶ 27.)

**D.    Procedural History**

After McIntyre filed suit, H.B. moved to stay the proceedings pending arbitration. (R. 8, Def.'s Motion to Stay.) In granting H.B.'s motion, we found that McIntyre's submission of the completed credit card application "constituted an offer to contract that H.B. accepted when it approved his application and mailed the credit card and [Cardholder] Agreement to him." *McIntyre v. Household Bank*, 216 F. Supp. 2d 719, 722 (N.D. Ill. 2002). Because we found that McIntyre was a party to the Cardholder Agreement which had a facially-valid arbitration clause, we held that an arbitrator should resolve the dispute. *Id.* After the parties proceeded with arbitration, the arbitrator found that the terms of the Cardholder Agreement never went into effect because McIntyre had not used the card. (R. 59, Pl.'s Exs., Ex. G, Arbitrator's Award at 10.) As a result, we lifted the stay pending arbitration and ordered the parties to proceed before us on the merits of the case. *McIntyre v. Household Bank*, 02-C-1537, 2004 WL 1088228, *2 (N.D. Ill. May 14, 2004).

## PART I: MOTION FOR CLASS CERTIFICATION

McIntyre has moved for certification of the following class:

> All persons within the United States who had a credit card account opened in their name and fees charged to that account by [H.B.]—for which the cardholder agreement becomes effective as of the first use of the card or account or the first transaction—who never used the card to make a purchase or obtain a cash advance.

(R. 39, Pl.'s Class Cert. Mem. at 4.) H.B. objects to certification of the proposed class based on several grounds. For the reasons set forth below, we decline to certify the proposed class.

## LEGAL STANDARDS

A party seeking certification of a class has the burden of demonstrating that the proposed class meets the requirements of Federal Rule of Civil Procedure 23. *Trotter v. Kinclar*, 748 F.2d 1177, 1184 (7th Cir. 1984). The moving party must first demonstrate that the proposed class meets all of the requirements of Rule 23(a). *Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748, 760 (7th Cir. 2000). Those prerequisites are as follows: (1) the class is so numerous that joinder of the class members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the class representatives are typical of the claims or defenses of the class as a whole (typicality); and (4) the representatives will fairly and adequately protect the class interests (adequacy). *Id.* After demonstrating that the proposed class meets the Rule 23(a) prerequisites, the moving party must demonstrate that the class satisfies at least one of the Rule 23(b) requirements as well. *Id.*

The Court has broad discretion to determine whether a proposed class meets the Rule 23 certification requirements, which should be liberally construed to maintain the class action where possible. *Uhl v. Thoroughbred Tech. and Telecomm., Inc.*, 309 F.3d 978, 985 (7th Cir. 2002); *King v. Kansas City S. Indus., Inc.*, 519 F.2d 20, 25-26 (7th Cir. 1975). Whether a class should be certified is a distinct question from whether the plaintiff will ultimately prevail on the merits. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974). However, where a question bearing on the suitability of class certification under Rule 23 overlaps with a question on the merits, the

7

Seventh Circuit has stated that "the judge must make a preliminary inquiry into the merits." *Szabo v. Bridgeport Mach., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001). In other words, we should "make whatever factual and legal inquiries are necessary" to determine whether the proposed class meets the Rule 23 certification requirements. *Id.*

## ANALYSIS

McIntyre asserts that his proposed class meets all of the Rule 23(a) requirements and that it qualifies for certification under Rules 23(b)(2) and 23(b)(3). Defendants object to certification, arguing that the proposed class fails for lack of numerosity, typicality, adequacy, and appropriateness for certification under either Rule 23(b)(2) or 23(b)(3). As discussed below, we find that although McIntyre has made an adequate showing of numerosity, the class as proposed fails to meet almost every other Rule 23 criterion. As a result, we must deny McIntyre's motion for class certification.

## I. Rule 23(a) Requirements

### A. Numerosity

As noted above, Rule 23(a) requires that a proposed class be so numerous that joinder is impractical. "Where the class is large, the numbers alone are dispositive of the impracticability of joinder," and the Court need not consider other factors to determine whether the numerosity requirement is met. *Thillens, Inc. v. Comty. Currency Exch. Ass'n of Ill., Inc.*, 97 F.R.D. 668, 677 (N.D. Ill. 1983). McIntyre asserts that his proposed class is made up of 52,000 people. (R. 39, Pl.'s Class Cert. Mem. at 4.) That number of class members is plainly sufficient to meet the Rule 23(a)(1) numerosity requirement. *See, e.g.,Hochschuler v. G.D. Searle & Co.*, 82 F.R.D. 339, 343 (N.D. Ill. 1978) (noting that class of 1,000 meets numerosity requirement).

8

H.B. does not dispute that this is the number of potential class members under the class definition proposed by McIntyre—indeed, H.B. supplied this figure as the number of people who "received the 'use' agreement, had an account opened in their name, and subsequently had no debit activity . . . on their account." (R. 39, Pl.'s Class Cert. Mem., Ex. 4, 8/31/04 Letter.) Rather, H.B.'s numerosity objections hinge on its own re-definitions of the proposed class. H.B. first argues that McIntyre hasn't established numerosity because he is "unique" as far as his alleged failure to receive periodic statements. (R. 40, Def.'s Class Cert. Resp. at 11.) H.B.'s second argument against numerosity is that the number of cardholders with the "first use" Cardholder Agreement whose annual fees were not reversed and who never used the card is only 350, and the number of them who have valid claims under the Illinois Consumer Fraud Act or for unjust enrichment is even smaller. (*Id.* at 12.)

H.B.'s numerosity arguments fail because McIntyre's proposed class is not limited to individuals who never received periodic statements or to those whose fees were not reversed. The class is broadly defined to include anyone who had a credit card account opened in their name and fees charged to that account by H.B. even though they never used the card and their cardholder agreements became effective as of the first use of the card. (R. 39, Pl.'s Class Cert. Mem. at 4.) While McIntyre's position as far as the allegedly absent periodic statements certainly raises typicality concerns, it does not destroy the numerosity of the proposed class. Similarly, while those whose fees were reversed may have different claims than individuals who paid fees and were not reimbursed, that fact does not effect the numerosity of the class either. H.B. has brought forth no evidence that the class, *as proposed by McIntyre*, consists of fewer than 52,000 individuals. As a result, we find that McIntyre has met his burden of showing that

9

the proposed class meets the Rule 23(a)(1) numerosity requirement.

## B. Commonality

Rule 23(a)(2) requires a showing of questions of law or fact common to the class. To satisfy this requirement, McIntyre simply must demonstrate that there is at least one common question of law or of fact. *Nat'l Org. for Women, Inc. v. Scheidler*, 172 F.R.D. 351, 360 (N.D. Ill. 1997). Factual variation among class members' grievances will not defeat commonality. *Rosario v. Livaditis*, 963 F.2d 1013, 1017-18 (7th Cir. 1992). Instead, it is sufficient for McIntyre to demonstrate that the claims arise from a common nucleus of operative fact. *Id.*

In his motion for class certification, McIntyre sets forth five questions of law and fact that he argues are common to the class. (R. 39, Pl.'s Class Cert. Mem. at 6-7.) While H.B. argues that certification is inappropriate under Rule 23(b)(3) because individual issues predominate, it has not challenged commonality specifically under Rule 23(a)(2). Nevertheless, we have concerns regarding whether or not McIntyre has met his burden of showing that these questions of law and fact truly pertain to the class as a whole. For example, McIntyre's first common question is "whether [H.B.]'s unilateral activation of the credit card accounts . . . is contrary to [H.B.]'s representation in its proposed Cardholder Agreement that the terms of the agreement would not apply until the consumer's first use of the card." (*Id.* at 6.) Not all class members received the same cardholder agreement. (R. 49, Pl.'s Class Cert. Reply at 5.) As a result, the Court may be forced to review the different cardholder agreements that the proposed class members received in order to determine whether the language at issue had the same effect on all members. *Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 984 F.2d 223, 226 (7th Cir. 1993) (noting the principle that contractual terms must be interpreted "not merely by reference to

10

particular words or isolated phrases, but by viewing each part in light of the others") (internal citation omitted). The unknown quantity of cardholder agreement variations distributed to class members raises concerns regarding the manageability of this broadly defined class.

The second common question McIntyre cites is: "whether [H.B.] failed to send monthly billing statements to Plaintiff and the class informing them that [H.B.] had opened credit card accounts on their behalf, and showing the charges that [H.B.] had imposed on the accounts." (R. 39, Pl.'s Class Cert. Mem. at 7.) Yet McIntyre claims in his reply brief that H.B. sent some class members deceptive periodic statements. (R. 49, Pl.'s Class Cert. Reply at 10-11.) Thus McIntyre's own briefing indicates that some class members received periodic statements and others did not. The absence of periodic statements issue is therefore not common to the class as a whole.

McIntyre's remaining three common questions broadly re-state the claims in the complaint. (R. 39, Pl.'s Class Cert. Mem. at 7.) While the legal theories supporting those broad claims varies among class members, those questions do pertain to the class as a whole. As the threshold for commonality under Rule 23(a)(2) is not a high one, we find that McIntyre has adequately shown commonality. *See Nat'l Org. for Women*, 172 F.R.D. at 360 (stating that one common question is sufficient for commonality).

**C. Typicality**

McIntyre's case for class certification deteriorates most drastically at the typicality prong of our analysis. The briefing on this issue reveals that the theories on which McIntyre claims he is entitled to relief vary substantially from those of the class as a whole. The Rule 23(a)(3) typicality requirement does not mean that all plaintiffs must present identical factual

circumstances or injuries. *Hispanics United of DuPage Cty. v. Village of Addison, Ill.*, 160 F.R.D. 681, 689 (N.D. Ill. 1995). The requirement does, however, mandate similarity of legal theory. Typicality exists where the named plaintiff's claims arise out of the "same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 596-97 (7th Cir. 1993) (citation omitted). The Seventh Circuit has also indicated that "even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation." *J.H. Cohn & Co. v. Am. Appraisal Assoc., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980). Applying these principles to McIntyre's proposed class, we find that McIntyre fails to meet the typicality requirement on a number of fronts.

The first major obstacle to McIntyre's typicality is the problem of the timeliness of his TILA claims. Actions under TILA must be commenced "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e). McIntyre argues that the statute of limitations should be equitably tolled for any class member, including McIntyre, for whom the alleged violation occurred more than one year before the initial complaint in this case was filed. (R. 49, Pl.'s Class Cert. Reply at 8-12.) The merits of McIntyre's equitable tolling argument are not relevant at the class certification stage. *See Eisen*, 417 U.S. at 177. What is very relevant, however, is that McIntyre's theory for tolling the statute of limitations is distinct from the theory on which he argues that the claims of the rest of the class should be tolled. *See Retired Chi. Police Ass'n*, 7 F.3d at 597.

McIntyre argues that the statute of limitations for his TILA claims should be equitably

12

tolled because he never received notice from H.B. making him aware that an account had been opened in his name and that charges had been applied to that account.[6] (R. 49, Pl.'s Class Cert. Reply at 9-10.) McIntyre's argument that the statute of limitations should be tolled for the remainder of the class, on the other hand, is based on "the deceptive nature of the bills that [H.B.] sent combined with [H.B.]'s fraudulent scheme to hide the refundable nature of the charge[.]"[7] (R. 49, Pl.'s Class Cert. Reply at 10.) These two theories are mutually exclusive, describe distinct courses of conduct, and will require very different offerings of proof. McIntyre's claims are therefore not typical of the class as a whole.

These distinct theories also demonstrate that H.B. has a unique defense against McIntyre based on the statute of limitations. Even an arguable defense that is peculiar to only a small subset of the class is enough to destroy typicality under Rule 23. *J.H. Cohn & Co.*, 628 F.2d at 999. McIntyre is likely to spend a great deal of effort—as indicated in the summary judgment

---

[6]While McIntyre frames his lack of awareness as an argument for equitable tolling, it is more accurate to say that McIntyre is asking the Court apply the discovery rule to his claims. *See Cada v. Baxter Healthcare Corp.*, 920 F.2d 446 (7th Cir. 1990). As the Seventh Circuit has clarified, the discovery rule "postpones the beginning of the limitations period from the date when the plaintiff is wronged to the date when he discovers he has been injured[.]" *Id.* at 450. Equitable tolling, on the other hand, applies where "the plaintiff is assumed to know that he has been injured, so that the statute of limitations has begun to run; but he cannot obtain information necessary to decide whether the injury is due to wrongdoing and, if so, wrongdoing by the defendant." *Id.* at 451. McIntyre's argument does not ask us to assume that he knew he was injured before March 2001 but could not obtain information about the cause of that wrongdoing until that time; instead, he argues that he was unaware that he had been injured until he received a letter from a collection agency and called H.B. in March 2001. (R. 49, Pl.'s Class Cert. Reply at 9.) Thus, McIntyre has actually argued for application of the discovery rule. *Cada*, 920 F.2d at 450.

[7]This is indeed an argument for equitable tolling, since McIntyre suggests that the class had notice of their injuries—and this is necessarily so, as class members who paid the charged fees must have been aware that those fees had been charged—but were prevented from discovering H.B.'s wrongdoing by its purportedly fraudulent scheme. *Cada*, 920 F.2d at 451.

briefing—in trying to prove his statute of limitations argument and thus he will expend time and resources on a theory that does not pertain to class members with timely claims. Moreover, because his theory for overcoming the statute of limitations differs substantially from other class members who have untimely claims, the unique defense problem is particularly heightened here. McIntyre will likely not only divert resources from those class members with timely claims to prove his own case, but he also will divert resources from those with untimely claims who received periodic statements. The uniqueness of H.B.'s statute of limitations defense as applied to McIntyre bolsters our conclusion that his claims are atypical. *Id.*

Even if we were to ignore the statute of limitations issues (which we cannot do), McIntyre's legal theory for recovery under TILA is not typical of the entire class. As we have already described, one of McIntyre's major substantive theories is that H.B. violated TILA by not sending McIntyre or the class members the periodic statements that TILA requires. (R. 34, Am. Compl. ¶¶ 37-40.) Yet McIntyre's proposed class includes individuals who did receive periodic statements. (R. 49, Pl.'s Class Cert. Reply at 10 (arguing that statute of limitations should be tolled for class members who received deceptive bills).) McIntyre's TILA claims thus not only are relatively unique in theory, but also arise from a course of conduct ascribed to H.B.—not mailing periodic statements—that is not typical of the alleged course of conduct directed toward many of the proposed class members who did receive those statements. As a result, McIntyre has not met the Rule 23(a)(3) requirement. *Retired Chi. Police Ass'n*, 7 F.3d at 597.

McIntyre's remaining count]s raise typicality concerns as well. For example, the legal theory under which McIntyre—who is an Alabama resident—asserts his Illinois Consumer Fraud Act claim is that Illinois law can apply to him and other non-Illinois class members under the

"most significant contacts" choice of law rule. (R. 49, Pl.'s Class Cert. Reply at 7-8.) McIntyre

has provided no analysis, however, to show that Illinois has a more significant relationship to the

issues in this case than any of the remaining state jurisdictions. *See, e.g., Spence v. Glock*, 227

F.3d 308, 312-13 (5th Cir. 2000) (finding it was error for district court to certify a class under a

"most significant relationship" analysis without examining the contacts and state policies for all

of the states). The only case that McIntyre cites in support of his theory that the Illinois

Consumer Fraud Act can be applied to national classes, *Avery v. State Farm Mutual Automobile*

*Insurance Company*, 746 N.E.2d 1242 (Ill. App. 2001), is currently on appeal to the Illinois

Supreme Court, *see* 786 N.E.2d 180 (Ill. 2002).[8]

The Court has previously recognized a split in this district as to whether the Illinois

Consumer Fraud Act can even be invoked by a non-Illinois resident. *See Man Roland Inc. v.*

*Quantum Color Corp.*, 57 F. Supp. 2d 568, 574-75 (N.D. Ill. 1999); *Hastings v. Fidelity Mort.*

*Decisions Corp.*, 984 F. Supp. 600, 615 (N.D. Ill. 1997). The decisions that have given the most

liberal and generous reading of the statute have found that a non-Illinois resident can invoke the

Illinois Consumer Act, but only in cases where the defendant is located in Illinois or the

deceptive acts and practices took place in Illinois. *See, e.g., Man Roland*, 57 F. Supp. 2d at 574-

75; *Hastings*, 984 F. Supp. at 615; *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 339-40 (N.D.

_____

[8] In *Avery*, moreover, the court certified the class only after analyzing the substantive laws
of the states where class members resided to screen for conflicts and after reviewing the
plaintiff's evidence that the defendant was headquartered and chartered in Illinois, and that there
was "substantial evidence" that the allegedly deceptive practices were "designed, established, and
initiated" in Illinois. *Id.* at 1254-55.

15

Ill. 1997).[9] The legal theory under which McIntyre must pursue his Illinois Consumer Fraud Act claim thus differs substantially from that available to Illinois class members, who could proceed based on their status as Illinois consumers. Moreover, McIntyre has failed to demonstrate that this case has the necessary ties to Illinois to justify application of the Illinois Consumer Fraud Act to a nationwide class.[10]

Finally, McIntyre's unjust enrichment claim differs in theory from the unjust enrichment claims of many class members. McIntyre argues that all of the proposed class members are entitled to restitution for H.B.'s unjust enrichment either in wrongfully collecting fees from class members or from reporting the "illegally opened accounts" to collection agencies. (R. 49, Pl.'s Class Cert. Reply at 13-14.) H.B. asserts, however, that there are only 350 individuals within the proposed class who had annual fees charged to their account that were not reversed. (R. 40,

---

[9]*See also Clark v. Tap Pharm. Prods., Inc.*, 798 N.E.2d 123, 130 (Ill. App. 2003).

[10]The evidence McIntyre has submitted on this issue simply does not support his assertions. First, McIntyre cites Muenchau's deposition testimony for the proposition that H.B.'s corporate headquarters is in Illinois. (R. 49, Pl.'s Class Cert. Reply at 8.) In the cited testimony, Muenchau denies that she knows if the Illinois location is H.B.'s "legal headquarters" and states that she does not call it corporate headquarters. (*Id.*, Ex. C, Muenchau Dep. at 31.) Her statement that "I've heard that Household in Chicago is corporate headquarters" is both ambiguous in that it is unclear which Household entity she is referring to, and pure hearsay. (*Id.*) Second, McIntyre contends that Muenchau testified that H.B.'s corporate officers "conduct business in Illinois" and that the Cardholder Agreement was drafted in the legal department located there. (*Id.* at 8.) Muenchau testified that she "believe[s]" corporate officers have offices in Illinois but "I couldn't tell you if they really are [there] or not." (*Id.*, Ex. C, Muenchau Dep. at 32.) The cited testimony makes absolutely no reference to either the Cardholder Agreement or the Legal Department. (*Id.*) This testimony is not only ambiguous as to the entity discussed, but shows equivocation on Muenchau's part. Finally, McIntyre argues that the solicitations were mailed from Illinois. (*Id.* at 8.) In the testimony cited to support this proposition, Muenchau plainly states that she can not tell where the mailings were sent from. (*Id.*, Ex. C, Muenchau Dep. at 38.) None of this evidence demonstrates that H.B. or the alleged deceptive practices have an Illinois connection.

Def.'s Class Cert. Resp. At 12; R. 37, Pl.'s Class Cert. Mem., Ex. 3, 7/16/04 Letter.) This

indicates that the vast majority of class members would not have the unjust enrichment claims

that McIntyre describes. Moreover, H.B. will have different defenses to the unjust enrichment

claim based on whether it reversed the class member's fee, collected payment on the fee, or sold

the unpaid account to a collection agency. (R. 40, Def.'s Resp. to Class Cert. at 4, 6.) For all the

reasons we have described, we find that typicality is a bar to certification of McIntyre's proposed

class.

### D.    Adequacy

McIntyre has also failed to demonstrate that the proposed class meets Rule 23's adequacy

requirement.  Under Rule 23(a)(3), McIntyre must demonstrate that his claims are not

antagonistic to the class's claims, that he has a sufficient interest in the case's outcome to ensure

vigorous advocacy, and that his counsel are qualified and able to vigorously conduct the

litigation.[11]  *Gammon v. G.C. Serv. L.P.*, 162 F.R.D. 313, 317 (N.D. Ill. 1995).  The adequacy

threshold is met where "the Court is assured that the named parties are qualified and capable of

fully pursuing the common goals of the class without collusion or conflicts of interest[.]"

*Ridings v. Canadian Imperial Bank of Commerce Trust Co. (Bahamas) Ltd.*, 94 F.R.D. 147, 154

(N.D. Ill. 1982) (citation omitted).

---

[11]H.B. argues that McIntyre is an inadequate class representative because he is unreliable, and because his attorneys lack expertise to prosecute this case. (R. 40, Def.'s Resp. to Class Cert. at 10-11.)  H.B.'s argument regarding McIntyre's reliability stems from his initial allegation that he never applied for the H.B. credit card.  (*Id.*)  While we are unwilling to credit McIntyre's argument that this is a "minor mistake," (R. 49, Class Cert. Reply at 12), we do not think McIntyre's change in position renders him unqualified to represent the class.  And while the fact that McIntyre's counsel waited one year from the date they were initially contacted by McIntyre to file the complaint knowing that TILA has a one-year statute of limitations gives us pause, we are unwilling to find that this renders counsel unqualified.

17

We find that many of the problems that we have already described could prevent McIntyre from fully pursuing the common class goals without collusion. First, McIntyre's theory for overcoming the TILA statute of limitations is distinct from the theory that McIntyre has applied to the remainder of the class. (R. 49, Pl.'s Class Cert. Reply at 9-12.) This distinction creates a conflict of interest because McIntyre will be motivated to divert time and resources away from the class to support his somewhat unique statute of limitations theory. *J.H. Cohn & Co.*, 628 F.2d at 999. Second, McIntyre's theory that H.B. never sent periodic statements conflicts with the class's theory that H.B. sent periodic statements that were deceptive in nature. (R. 49, Pl.'s Class Cert. Reply at 9-12.) Evidence that H.B. sent periodic statements, even if they were legally deceptive, would contradict McIntyre's own claims that H.B. never sent those statements and could undermine his theory for overcoming the one-year statue of limitations. This conflict of interest creates a major adequacy barrier. *Gammon*, 162 F.R.D. at 317 (noting that whether the named plaintiff's claims may conflict with the class's claims is an adequacy factor).

Even though we find that McIntyre has not demonstrated that the proposed class meets the Rule 23(a) typicality and adequacy requirements, in the interest of thoroughness, and because of the extensive time and resources that the parties have spent pursuing this litigation, we will also address the Rule 23(b) barriers to class certification that exist in this case.

## II.     Rule 23(b)(2)

Rule 23(b)(2) permits class certification where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." "[T]he

primary limitation on the use of Rule 23(b)(2) is the requirement that injunctive or declaratory relief be the predominant remedy requested for the class members." *Doe v. Guardian Life Ins. Co. of Am.*, 145 F.R.D. 466, 477 (N.D. Ill. 1992). McIntyre argues that the proposed class should be certified under Rule 23(b)(2) because it challenges policies that were applied to a large number of people, and because injunctive relief is necessary to stop H.B. from unilaterally activating accounts, to stop collection activities on those accounts, and to correct the false credit reports of those class members whose accounts were submitted to collection agencies.[12] (R. 39, Pl.'s Class Cert. Mem. at 11-12; R. 49, Pl.'s Class Cert. Reply at 14-15.)

We find that McIntyre's proposed class does not qualify for certification under Rule 23(b)(2). First, McIntyre's complaint and class certification briefing describe not one policy generally applicable to the class, but two. McIntyre claims that H.B. has a practice of unilaterally activating accounts and not sending periodic statements to notify class members of those accounts, (R. 34, Am. Compl. ¶¶ 38-40), but he also argues that H.B. has a practice of unilaterally activating accounts and then defrauding consumers about the refundable nature of the fee by sending them deceptive periodic notices, (R. 49, Class Cert. Reply at 10-12). The former practice does not apply to any class member who received periodic statements. The latter practice does not apply to McIntyre, or any other class members who allegedly did not receive periodic statements. Certification under Rule 23(b)(2) is only appropriate where the defendant

_____

[12]McIntyre also argues that he requires injunctive relief to stop H.B.'s practice of "targeting consumers with poor credit through the use of 'up to' solicitations" as outlined in a recent Advisory Letter from the Comptroller of the Currency, Administrator of the National Banks. (49, Pl.'s Class Cert. Reply at 14-15.) The Court denied McIntyre's request to amend its complaint to challenge this practice. (R. 55.) Neither McIntyre nor the class, therefore, is entitled to this form of injunctive relief based on the first amended complaint.

acts on grounds that are generally applicable to the class. Fed. R. Civ. P. 23(b)(2). As McIntyre's first amended complaint and briefing reveal, that is not the case here.

Nor can it be said that injunctive relief is the predominant form of relief McIntyre seeks on behalf of the class as required for certification under Rule 23(b)(2). *See Lemon v. Int'l Union of Operating Eng'rs, Local No. 139*, 216 F.3d 577, 582 (7th Cir. 2000) (vacating district court opinion certifying class under Rule 23(b)(2) where "the requested money damages are not incidental to the plaintiffs' requested equitable relief"). McIntyre seeks several forms of relief on behalf of the proposed class: actual, statutory, and punitive damages; disgorgement of money; injunctive relief to end deceptive practices, clear class members' tainted credit reports, and stop collection efforts on the accounts; declaratory relief; and pre-judgment and post-judgment interest, fees, and costs. (R. 34, Am. Compl. at 11-12.) In his reply brief, McIntyre argues that even if H.B. has deceased the described practices and is not pursuing collection of the fees, certification under Rule 23(b)(2) is appropriate because false credit reports filed against those class members who did not pay the allegedly illegal fees can only be corrected through an injunction. (R. 49, Class Cert. Reply at 14.) Such an injunction, however, would not apply to any class member who paid the fee or who had the fee reversed. McIntyre's request for damages, on the other hand, applies to each and every proposed class member. It thus cannot be said that McIntyre's request for an injunction is the predominant relief sought in this case. Therefore class certification pursuant to Rule 23(b)(2) is not appropriate. *Lemon*, 216 F.3d at 582.

## III.    Rule 23(b)(3)

Rule 23(b)(3) permits class certification where "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only

individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." In order to satisfy this requirement, McIntyre must show that the common issues outweigh any individual questions. *Dhamer v. Bristol-Meyers Squibb Co.*, 183 F.R.D. 520, 529 (N.D. Ill. 1998).

We find that individual questions of fact and law predominate in this case. In particular, whether McIntyre and other class members who claim they did not receive periodic statements can overcome H.B.'s statute of limitations defense can only be determined by an individualized fact inquiry. H.B. has submitted evidence to show that its regular business practice was to send periodic statements to account-holders like McIntyre. (R. 40, Def.'s Resp. to Class Cert. at 5 & Ex. 1, Muenchau Decl. ¶¶ 8-9.) Thus to prove his lack of notice, McIntyre will have to submit individualized evidence such as any changes in his address, whether other mail was received without incident, and whether anyone else at his home could have intercepted his mail. Similar individualized proof would have to be submitted to demonstrate that other class members did not receive periodic statements. None of this proof would support the claims, however, of those class members arguing they paid charged fees because they were deceived about the nature of those fees after receiving H.B.'s allegedly deceptive periodic statements.

There are additional individualized questions that pertain to the proposed class that raise 23(b)(3) concerns. For example, as previously discussed, certifying the proposed class would require the Court to undertake individualized inquiries into the particular language of all the various disclosures agreements class members received, which could lead to varying outcomes depending on document language. Whether or not a particular class member has a TILA claim based on the Regulation Z Sections regarding periodic statements turns on the individual proof

21

described above regarding whether they received statements. Also, whether H.B. "unilaterally" opened accounts as alleged, (R. 34, Am. Compl. ¶ 41), will require individual proof of whether class members applied for or otherwise requested accounts. Finally, McIntyre's briefs demonstrate that the class members' unjust enrichment claims turn on individualized questions of whether the class member paid the annul fee, failed to pay the annual fee to the detriment of their credit history, or paid nothing because H.B. reversed the fee.

Furthermore, as H.B. points out, McIntyre's request for actual damages necessitates an individualized inquiry. (R. 40, Def.'s Class Cert. Resp. at 13.) Many circuits have held that a request for actual damages under TILA requires individual proof regarding the plaintiff's reliance on an allegedly improper disclosure. *See Gold Country Lenders v. Smith (In re Smith)*, 289 F.3d 1155 (9th Cir. 2002); *Turner v. Beneficial Corp.*, 242 F.3d 1023, 1028 (11th Cir. 2001) (en banc); *Perrone v. General Motors Acceptance Corp.*, 232 F.3d 433, 436 (5th Cir. 2000); *Peters v. Jim Lupient Oldsmobile Co.*, 220 F.3d 915, 917 (8th Cir. 2000); *Stout v. Byrider*, 228 F.3d 709, 718 (6th Cir. 2000). As a result, the individual issues of causation and actual damages under TILA are inappropriate for certification. *Abt v. Mazda American Credit*, 98 C 2931, 1999 WL 350738, at *2 (N.D. Ill. May 19, 1999). We decline, however, to hold that "individual issues necessarily predominate common issues in every TILA or [Illinois Consumer Fraud Act] action seeking actual damages. That would be an extremely impractical and undesirable result." *Id.* While standing alone, McIntyre's request for actual damages would not defeat certification under Rule 23(b)(2), when we view this factor in combination with the other individualized issues connected to the proposed class, it is clear that individual issues predominate.

While we recognize that the class action mechanism may often be useful in remedying

alleged TILA violations, here the myriad of variables and differences among the proposed class members render this case unsuitable for certification. McIntyre failed to demonstrate his typicality or adequacy under Rule 23(a) and failed to show that certification is appropriate under either Rule 23(b)(2) or Rule 23(b)(3). As a result, we deny McIntyre's motion for class certification.

## PART II: MOTION FOR SUMMARY JUDGMENT

Now that we have resolved the class certification issue, we will address whether H.B. is entitled to summary judgment on McIntyre's individual claims. H.B. has moved for summary judgment on all three counts of McIntyre's first amended complaint, arguing that there are no material facts pertaining to any of the claims left to be resolved at trial. For the reasons set forth below, H.B.'s motion for summary judgment is granted in part and denied in part.

## LEGAL STANDARDS

We will grant a motion for summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In resolving a summary judgment motion, the Court will neither decide factual disputes nor weigh conflicting evidence, but instead will limit its inquiry to whether a genuine issue of material fact exists for trial. *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 436 (7th Cir. 2000). While we will consider all facts in the light most favorable to the nonmoving party, to avoid summary judgment the nonmoving party must submit competent and specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assoc., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990).

## ANALYSIS

In its summary judgment motion, H.B. argues that there are no material disputed facts requiring a trial on McIntyre's TILA, Illinois Consumer Fraud Act, and unjust enrichment claims. We will address each count in turn.

## I.    Count One: TILA

H.B. argues that it is entitled to summary judgment on all of McIntyre's TILA claims because they are barred by the statute of limitations and because they fail on the merits. We will address both arguments below.

### A.    Statute of Limitations

H.B. argues that it is entitled to summary judgment on McIntyre's TILA claims because those claims are barred by TILA's one-year statute of limitations. (R. 47-2, Def.'s Summ. J. Mem. at 9-10.) McIntyre applied for a credit card with H.B. on or around February 10, 2000, and H.B. sent him a credit card thereafter. (R. 58, Pl.'s Resp. to Def.'s Facts ¶¶ 8-12; R. 59, Pl.'s Exs., Ex. C, McIntyre Dep. at 72:7-16, 81-82.) Although McIntyre did not file suit against H.B. until March 1, 2002, he argues that the one-year statute of limitations should be "equitably tolled" because "[t]he first time [he] became aware of the account was when he called [H.B.] on March 5, 2001 to inquire about a letter he had received from a collection agency."[13] (R. 57, Pl.'s S.J. Resp. at 5.)

As discussed in footnote six *supra*, McIntyre's argument is most accurately described as a request for a finding that McIntyre did not discover his injury (the existence of the account and

---

[13]Although the collection agency letter was dated February 21, 2001, McIntyre asserts that he does not remember the date on which he received it, and that, in any event, that letter did not put him on notice because he believed it had been sent in error. (*Id.*)

fee), and thus his claim did not accrue, until March 5, 2001. *Cada*, 920 F.2d at 450-51. The Seventh Circuit has made clear that the discovery rule—as a matter of federal common law—is read into statutes of limitations in federal-question cases in the absence of a contrary directive from Congress. *Id.* at 450. The discovery rule applies to the TILA statute of limitations. *See Estate of Henderson ex rel. Johnson v. Meritage Mort. Corp.*, 293 F. Supp. 2d 830, 834-35 (N.D. Ill. 2003); *Kent v. Celozzi-Ettleson Chevrolet, Inc.*, No. 99-C-2868, 1999 WL 1021044, at *6 (N.D. Ill. Nov. 3, 1999).

H.B. argues that McIntyre's claims accrued before March 2001 because he received multiple notices about the existing account and fee long before that date. First, H.B. argues that McIntyre's claims accrued when he received the initial disclosures along with his credit card solicitation in February 2000. (R. 47-2, Def.'s S.J. Mem. at 9.) McIntyre asserts, however, that the initial disclosure statement "does not disclose that finance charges will begin to accrue on the card or account before the card is used" even though that was H.B.'s practice. (R. 34, Am. Compl. ¶ 36.) McIntyre's disclosure claim thus rests on the theory that McIntyre could not have known from reviewing the initial disclosure statement that a finance charge would be added to his card before he used it. (*Id.*) Under his theory, McIntyre's TILA claim regarding the allegedly improper disclosure would have accrued, not when he reviewed the initial disclosure statement, but on the date that he discovered that the finance charge had been applied to his account.

Second, H.B. argues that McIntyre received seven periodic statements from H.B. between March and September of 2000, any one of which sufficed to put him on notice of his TILA claims. (R. 47-2, Def.'s S.J. Mem. at 9.) H.B. further argues that it sent McIntyre a dunning letter in April 2000 that put him on notice of his claims. (*Id.*) We agree that if McIntyre received

any periodic statements or related correspondence any time before March 1, 2001, his claims would have accrued at that time. Whether McIntyre received those statements, however, is a material fact that is still in dispute.

H.B. has shown that its regular business practice is to generate periodic statements for its account holders and that it contracts with a third party to mail those statements to the address listed in the account holder's credit card application. (R. 58, Pl.'s Resp. to Def.'s Facts ¶¶ 18, 21.) H.B. has submitted documentary evidence that seven periodic statements were generated for McIntyre's account. (R. 48, Def.'s Facts, Ex. 1D, Periodic Statements.) H.B. has also submitted evidence that the dunning letter was mailed to McIntyre "on or about" April 15, 2000. (*Id.*, Ex. 1, Muenchau Decl. ¶ 11 & Exs. 1(E-F), Electronic Records.) H.B. has submitted further evidence of its regular business practice for recording any change in address information or periodic statements that are returned as undeliverable. (*Id.*, Ex. 3, Muenchau Decl. ¶¶ 14-15.) H.B.'s records do not indicate that any periodic statements sent to McIntyre were returned as undeliverable or that any address change was made on McIntyre's account. (*Id.*)

H.B. argues that the submitted evidence is sufficient to establish a presumption that McIntyre received the periodic statements. (R. 47-2, Def.'s S.J. Mem. at 8 (citing *Nixon v. Arrow Fin. Servs.*, No. 02-C-3431, 2003 WL 22427765, at *3 (N.D. Ill., Oct. 21, 2003).) As recognized in the *Nixon* case, the long-standing mailing rule dictates that "evidence that a letter was properly addressed and deposited with the post office gives rise to a rebuttable presumption that the addressee received the letter . . . ." 2003 WL 22427765, at *3 (citing *In re Longardner & Assoc., Inc.*, 855 F2d 455, 459 (7th Cir. 1988)). Where the recipient categorically denies receipt, however, a question of fact exists rendering summary judgment inappropriate. *Id.*; *Jones v.*

*Citibank, Fed. Sav. Bank*, 844 F. Supp. 437, 442 (N.D. Ill. 1994).

In this case, much of McIntyre's TILA claims rest on his denial that he ever received a periodic statement. (R. 34, Am. Compl. ¶¶ 37-40.) He has also denied receiving any other correspondence from H.B. notifying him of the account balance. (R. 58, Pl.'s Stat. of Add'l Facts ¶ 13.) In support of this denial, McIntyre offers his deposition testimony that he "did not even realize that there was anything pertaining to Household until" he received a letter from a collection agency. (*Id.*; R. 59, Pl.'s Exs., Ex. C, McIntyre Dep. at 106.) While that broad denial may constitute a rather flimsy hook from which to hang one's federal claims, at this stage in the litigation we are required to refrain from credibility determinations and view all of the facts in McIntyre's favor.[14] As a result, we find that McIntyre's denial raises an issue of fact regarding whether or not McIntyre received the periodic statements or dunning letter.

Finally, H.B. argues that the statute of limitations bars McIntyre's TILA claims because he received the collection agency's letter in February 2001. (R. 47-2, Def.'s Summ. J. Mem. at 9-10.) Although it is undisputed that the collection letter bears the date February 21, 2001, there is no evidence regarding the date on which the letter was sent or the date on which McIntyre received it. McIntyre testified that he cannot remember the date on which he received the letter. (R. 59, Pl.'s Exs., Ex. C, McIntyre Dep. at 102.) Because H.B. has submitted no evidence regarding when the collection agency's letter was mailed or received by McIntyre, there is a genuine issue of material fact as to whether McIntyre received the letter prior to March 1, 2001.

---

[14]H.B.'s throw-up-your-hands argument on reply that McIntyre's denial is "incredible," (R. 66, Def.'s Summ. J. Reply at 5), while perhaps understandable, is precisely the kind of credibility determination that we are prohibited from considering at the summary judgment stage. *Morfin v. City of E. Chi.*, 349 F.3d 989, 999 (7th Cir. 2003) (stating that "a credibility determination at the summary-judgment stage constitutes error").

As such, we cannot find at this stage that McIntyre's claims are barred by TILA's statute of limitations.

### B.    The Merits of McIntyre's TILA Claims

Count One of McIntyre's first amended complaint identifies five separate and specific TILA violations, all arising from section 1637 of TILA and Federal Reserve Board Regulation Z, 12 C.F.R. § 226. Two of the alleged TILA violations merit little discussion. First, McIntyre's claim that H.B. violated Regulation Z, Section 226.12(a) by "unilaterally opening accounts without an authorization from [the] consumer," (R. 34, Am. Compl. ¶ 41), is contradicted by McIntyre's admission that he applied for an account with H.B.[15] (R. 58, Pl.'s Resp. to Def.'s Facts ¶¶ 3-12.) Similarly, McIntyre's claim under Regulation Z, Section 226.17, (R. 34, Am. Compl. ¶ 42), fails because—as H.B. points out—that regulation only applies to closed-end credit. 12 C.F.R. § 226.17. McIntyre's H.B. account is for open-ended credit as defined by the regulations, and therefore is not subject to Section 226.17. *See* 12 C.F.R. § 226.2 (10) & (20). McIntyre has made no effort in his response to H.B.'s motion for summary judgment to defend these two allegations. As a result, H.B.'s motion for summary judgment is granted with respect to McIntyre's TILA claims based on Regulation Z, Sections 226.12(a) and 226.17. We will address the remaining three alleged TILA violations below.

---

[15]Strangely, in his response to H.B.'s statement of facts McIntyre denies that H.B.'s "unilateral action" opened the account, thereby directly contradicting this claim. (R. 58, Pl.'s Resp. to Def.'s Facts ¶ 12.) Although this is an improper denial because it is not supported by any record evidence, it might explain McIntyre's failure to defend this allegation in its response to H.B.'s summary judgment motion.

### 1. Initial Disclosure Statement

McIntyre alleges that H.B.'s initial disclosure statement violates TILA and Regulation Z because it "does not disclose that finance charges will begin to accrue on the card or account before the card is used," but H.B. nonetheless imposed charges on McIntyre's "alleged account" before he used the card. (R. 34, Am. Compl. ¶ 36.) McIntyre argues that the initial disclosure statement therefore violated Regulation Z, Section 226.5(c)'s requirement that the disclosure "reflect the terms of the legal obligation between the parties."[16] (R. 57, Pl.'s Summ. J. Resp. at 2-3.) In the alternative, McIntyre argues that H.B. violated Regulation Z, Section 226.5(b) by charging the annual fee "prior to the disclosure" regarding the parties' legal obligations. (*Id.* at 4.)

Regulation Z, Section 226.5 sets forth the general disclosure requirements for open-ended credit. Section 226.5(c) states that "[d]isclosures shall reflect the terms of the legal obligation between the parties." 12 C.F.R. § 226.5(c). Section 226.5a sets forth a list of eleven specific items that must be disclosed in credit card applications and solicitations, including the annual fee. 12 C.F.R. § 226.5a(b). Section 226.6 contains a list of the specific items that must be disclosed in the initial disclosure statement. With respect to annual fees, this section specifies that creditors must disclose "[t]he amount of any charge other than a finance charge that may be

---

[16]While McIntyre also briefly argues in his response brief that the initial disclosure statement violates section 266.5(a) because the disclosures were not made "clearly and conspicuously," (R. 57, Pl.'s Summ. J. Resp. at 3), that is not at issue in this case because McIntyre made no allegations in his first amended complaint that H.B. violated section 226.5(a).

imposed as part of the plan, or an explanation of how the charge will be determined."[17]  12

C.F.R. § 226.6(b).  This requirement does not state a particular time at which the fact or amount

of the annual fee must be disclosed.  *Id.*

H.B. has shown that it is entitled to summary judgment on McIntyre's claim that the

initial disclosure statement violates TILA because it did not disclose that H.B. would charge the

account even if a customer did not use the card.  H.B.'s Initial Disclosure Statement declares that

"An Annual Fee of $79 will be charged on the date the Account is opened . . . ."  (R. 58, Pl.'s

Resp. to Def.'s Facts ¶ 5.)  This statement on its face meets the requirement of Regulation Z

Section 226.6(b) because it discloses the amount of the charge that may be imposed.  12 C.F.R. §

226.6(b).  McIntyre has pointed to no provision in Section 226.6—which governs initial

disclosure statements—to support his claim that the contingency of card use as the trigger to

activate the account must be disclosed in the initial disclosure statement.

Despite the Initial Disclosure Statement's compliance with the specific requirements of

Section 226.6, McIntyre argues that we should "liberally construe" the TILA requirements to find

that the Initial Disclosure Statement violates Section 226.5(c)'s general requirement that

disclosures "reflect the terms of the legal obligations between the parties."  (R. 57, Pl.'s Summ. J.

Resp. at 3 (citing *Ramadan v. Chase Manhattan Corp.*, 156 F.3d 499, 502 (3d Cir. 1998)).)

Essentially, McIntyre asks us to create a requirement through the general provision in section

226.5(c)—which applies to initial disclosure statements, solicitation disclosures, and periodic

statements—that does not exist in the specific requirements for initial disclosure statements that

_____

[17]An annual fee is distinct from a finance charge under Regulation Z.  12 C.F.R. §
226.4(c)(4).

Congress set forth in Section 226.6. McIntyre's argument ignores the canon of statutory construction that a specific statutory provision takes precedence over a general one. *Resolution Trust Corp. v. Gallagher*, 10 F.3d 416, 420 (7th Cir. 1993). Congress was very specific regarding the items that must be disclosed in an initial disclosure statement, and to read the general requirement that disclosures "reflect the terms of the legal obligations between the parties" to trump those specific requirements would violate that canon, and would render section 226.6 superfluous. *See Matter of Lifshultz Fast Freight Corp.*, 63 F.3d 621, 628 (7th Cir. 1995). We will not do so.

McIntyre's second argument pertaining to the initial disclosure requirements is that H.B. violated Regulation Z, Section 226.5(b) because it charged McIntyre's account before he received the Cardholder Agreement which disclosed that the card would be activated upon first use. (R. 57, Pl.'s Summ. J. Resp. at 3-4.) Section 226.5(b) states that "[t]he creditor shall furnish the initial disclosures statement required by Sec. 226.6 before the first transaction is made under the plan." 12 C.F.R. § 226.5(b). H.B. sent McIntyre the initial disclosure statement before it opened the account or applied the annual fee. (R. 58, Pl.'s Resp. to Def.'s Facts ¶¶ 4-5.) McIntyre argues that because the Cardholder Agreement's full title is "Cardholder Agreement and Disclosure Statement," H.B.'s act of charging the annual fee before sending McIntyre the Cardholder Agreement violates section 226.5(b). (R. 57, Pl.'s Summ. J. Resp. at 4.) The initial disclosure statement required by section 226.6 was sent with the solicitation. McIntyre has cited no authority to indicate that every disclosure made subsequent to the initial disclosure statement must comply with section 226.6, or even that there can be more than one initial disclosure statement for one account. As a result, we find that H.B. has met its burden of showing that it is

31

entitled to summary judgment on McIntyre's claims that H.B.'s initial disclosure statements violated TILA.

### 2. Periodic Statements

McIntyre's remaining TILA allegations are based on his claim that H.B. never sent him any periodic statements as required by TILA Section 1637 and its enforcing regulations. (R. 34, Am. Compl. ¶¶ 37-40.) TILA states that "[t]he creditor . . . shall transmit . . . for each billing cycle . . . a statement . . ." setting forth particular items. 15 U.S.C. § 1637(b). Regulation Z, Section 226.7 states that "[t]he creditor shall furnish the consumer with a periodic statement that discloses" a specific list of criteria. 12 C.F.R. § 226.7. Our analysis on the merits is slightly distinct from our discussion of McIntyre's notice for statute of limitation purposes. Because TILA requires that periodic statements be "furnished" rather than received, we will focus not on whether McIntyre received the periodic statements, but on whether there is any genuine issue of material fact that H.B. sent the periodic statements.[18]

In *Nixon*, the Court recognized that whether a communication is sent is a distinct question from whether a communication is received. 2003 WL 22427765, at *2-3. In that case, the defendant's representative averred that the defendant's electronic records showed that a communication had been delivered to the post office to be sent to the plaintiff's correct address. *Id.* at *2. When the plaintiff offered no evidence to rebut that claim other than his own equivocation regarding his receipt of the letter, the Court found a "total absence of a genuine

---

[18]Regulation Z section 226.5(b)(2) makes clear that the creditor's obligation is to "mail or deliver" the periodic statement; it says nothing regarding the creditor's obligation to ensure that the account holder receives a properly mailed or delivered statement. 12 C.F.R. § 226.5(b)(2)(i) & (ii).

issue of fact" that the mailing was sent. *Id.*

While ours is a very similar case, there is a significant difference in the evidence H.B. offers to prove the statements were sent that distinguishes this case from *Nixon*. H.B. has submitted competent evidence to show that its normal business practice is to send periodic statements to account holders, and that seven periodic statements were generated on McIntyre's account. H.B. has submitted no evidence, however, to indicate that the particular periodic statements generated for McIntyre were delivered to the post office or processed according to its general business practice. The absence of any electronic or other record demonstrating that the statements were sent is particularly conspicuous because H.B. did submit electronic records to show that the April 2000 dunning letter was sent. (R. 48, Def.'s Facts, Ex. 3, Muenchau Decl. ¶ 12; *Id.*, Ex. 1, Muenchau Decl. ¶ 11 & Exs. 1(E-F).) Because they have not cited affirmative evidence that McIntyre's statements were delivered to the post office, and given McIntyre's denial of receipt, we find that McIntyre has established that there is a genuine issue of fact as to whether H.B. furnished those statements.

At trial, McIntyre will have to offer much more than blanket denials and fuzzy memories to overcome H.B.'s evidence on the mailing issue. At the summary judgment stage, however, those mechanisms suffice to establish an issue of fact regarding whether the periodic statements were sent. As a result, we must deny H.B.'s motion for summary judgment with respect to the claims set forth in paragraphs 37 through 40 of the first amended complaint.

## II.    Count Two: Illinois Consumer Fraud Act

H.B. argues that it is entitled to summary judgment on McIntyre's Illinois Consumer Fraud Act claims because the statute does not apply to McIntyre as an out-of-state consumer. (R.

33

47-2, Def.'s Summ. J. Mem. at 10-11.) McIntyre, on the other hand, argues that the Act can be applied to him extraterritorially and that we can do so without violating due process because the case has a significant aggregation of contacts in Illinois. (R. 57, Pl.'s Summ. J. Resp. at 9-12.) As noted above, the Court has applied the Illinois Consumer Fraud Act to out-of-state consumers where the deceptive practices occur in Illinois or where the defendant is based in Illinois. *See Man Roland*, 57 F. Supp. 2d at 574-75; *Hastings*, 984 F. Supp. at 615; *Rohlfing*, 172 F.R.D. at 339-40. Even McIntyre acknowledges that the cases applying the Illinois Consumer Fraud Act to non-Illinois consumers have done so where the action is pursued "against a resident defendant where the deceptive acts and practices were perpetrated in Illinois." (R. 57, Pl.'s Summ. J. Resp. at 9.) Accordingly, for the purposes of H.B.'s summary judgment motion we must first determine whether there is any genuine issue of material fact as to where H.B. is located or where the allegedly deceptive practices occurred.

H.B.'s parent company, Household International, Inc., is located in Illinois.[19] (R. 67, Def.'s Resp. to Pl.'s Add'l Facts ¶ 2; R. 48, Def.'s Facts, Ex. 2, Federal Reserve System webpage.) There is no dispute, however, that H.B. is a national bank with its sole branch and organizational address in Nevada. (R. 58, Pl.'s Resp. to Def.'s Facts ¶ 2.) While McIntyre has attempted to create an issue of material fact by submitting a Dunn & Bradstreet, Inc. report which lists Household International, Inc.'s Illinois address as H.B.'s business address, that document is pure hearsay and thus does not refute H.B.'s evidence that it is located solely in Nevada. *Malec*,

---

[19]Household International, Inc. is not a party to this dispute. McIntyre has not argued that we should pierce H.B.'s corporate structure and treat Household International, Inc. as an interchangeable entity with H.B. We therefore limit our inquiry to whether there is a genuine issue of material fact regarding H.B.'s location or operation in Illinois.

191 F.R.D. at 585 (citing *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997)).

McIntyre makes numerous additional attempts to establish an issue of fact regarding H.B.'s Illinois contacts in his response brief, rather than his Local Rule 56.1 statement of material facts. This is an improper way to introduce facts at the summary judgment stage. *See Malec*, 191 F.R.D. at 586. We will nonetheless address each of these factual allegations to ensure that they do not create a fact issue regarding the applicability of the Illinois Consumer Fraud Act to McIntyre as an out-of-state consumer.

First, McIntyre submits two "OCC Letters" to support his assertion that H.B. is "managed and operated . . . from Household corporate headquarters in Illinois." (R. 57, Pl.'s Summ. J. Resp. at 11.) We have reviewed those letters and find no such statement. (R. 59, Pl.'s Exs., Ex. M, OCC Letters.) One of the letters purports to be from the "Administrator of National Banks" to Household International's general counsel, appears to be electronically signed, and discusses an application for an H.B. merger. The other letter is unsigned, but purports to be written by "Julie A. Davenport, Associate General Counsel" and is addressed to the "Office of the Secretary Federal Trade Commission." The letter is unsigned and does not identify what company or organization the writer represents or from where the letter was sent. McIntyre identifies no deposition testimony or under-oath declarations to identify or explain these documents. On their face, they simply do not support his factual assertion, let alone create an issue of fact regarding the location of H.B. or its operations.[20]

Second, McIntyre cites Muenchau's deposition to support the proposition that H.B.'s

---

[20]Because McIntyre has provided no context for these letters, we cannot establish whether they are records kept in the regular course of business or pure hearsay.

corporate headquarters is in Illinois. (R. 57, Pl.'s Summ. J. Resp. at 11.) The cited testimony does not support that factual assertion. Muenchau testified that "I don't know what -- if it's the legal headquarters. I just know that it's the Prospect Heights location . . . I've heard that Household in Chicago is corporate headquarters." (R. 59, Pl.'s Exs., Ex. A, Muenchau Dep. at 31:3-5, 15-16.) It is not clear from the cited testimony whether Muenchau was testifying about H.B. or Household International, Inc., and Muenchau's statement regarding what she "has heard" is clearly hearsay. As such, this statement does not create an issue of fact regarding H.B.'s location. *Malec*, 191 F.R.D. at 585.

Third, McIntyre submits the Dunn & Bradstreet, Inc. business report to establish that H.B.'s business address in Illinois. (R. 57, Pl.'s Summ. J. Resp. at 11.) For the reasons already stated, this document does not raise an issue of fact.

Fourth, McIntyre cites Muenchau's deposition to support the proposition that the "officers and directors of the company are located in Prospect Heights, Illinois." (R. 57, Pl.'s Summ. J. Resp. at 11.) There is simply no testimony anywhere on the cited page that discusses officers and directors, let alone that supports the proposition that they are located in Illinois. (R. 59, Pl.'s Exs., Ex. A, Muenchau Dep. at 31.) Moreover, it is still impossible to determine from the cited testimony whether Muenchau is talking about Household International, Inc., or H.B., or another Household subsidiary. This testimony does not create a material issue of fact concerning H.B.'s location.

Fifth, McIntyre cites Muenchau's deposition and an exhibit of postal receipts to establish that the credit card solicitations at issue here were mailed from Naperville, Illinois. (R. 57, Pl.'s Summ. J. Resp. at 11.) In the cited testimony, Muenchau explicitly denies her ability to explain

the postal receipts and testifies that she could not tell whether the mailings were sent from Naperville, Illinois. (R. 59, Pl.'s Exs., Ex. A, Muenchau Dep. at 38.) Without further explanation, the Court cannot identify whether the attached receipts are connected to the solicitations. (*Id.*, Ex. I, Receipts.) Thus, the record evidence does not support McIntyre's contention that the solicitation mailings were sent from Illinois, and that statement must be ignored.

Sixth, McIntyre again cites the "OCC Letters" to support the proposition that corporate counsel repeatedly refer to Household Bank (Nevada), N.A. and Household Bank (SB) collectively as "Household." (R. 57, Pl.'s Summ. J. Resp. at 11.) As previously noted, McIntyre has introduced no evidence to establish that either of those letters is from H.B.'s corporate counsel, and it is not possible for the Court to make that determination from the text of the letters. Moreover, whether or not corporate counsel referred in a letter to two corporate entities collectively as "Household" does nothing to establish that H.B. is located in Illinois or that the deceptive practices took place in Illinois.

Seventh, McIntyre states that H.B. produced an employee of a company called Household Credit Services, Inc. as its corporate representative who is most knowledgeable about the credit card application process. (*Id.*) This proposition is indeed supported by the cited evidence. This proposition is simply irrelevant, however, to the matter of H.B.'s corporate location or whether the deceptive practices took place in Illinois.

Eighth, and finally, McIntyre states that the corporate deposition was conducted at "Household headquarters in Prospect Heights, Illinois." (*Id.* at 11.) McIntyre does not assert that the corporate representative deponent works in Illinois, and H.B. asserts that her office is located

37

in Oregon. (R. 66, Def.'s Summ. J. Reply at 8 n.8.) The "Household headquarters" referred to is undisputedly the headquarters of Household International, Inc., but none of McIntyre's evidence demonstrates that it is also H.B. headquarters. The location of the deposition is hardly relevant; as H.B. points out, that H.B. "offered to make a witness available in Illinois, for the convenience of plaintiff, in connection with a suit filed in Illinois, does not make Bank a resident of Illinois." (*Id.*)

We find that there is no genuine issue of fact regarding H.B.'s corporate headquarters or operations location. Household has submitted competent evidence to show that H.B. is located and operates only in Nevada. (R. 67, Def.'s Resp. to Pl.'s Facts ¶ 2 & Ex. 6, Guy Decl. ¶¶ 4-7.) Because H.B. made that showing, the burden is on McIntyre to present "specific, concrete evidence" to show that there is a genuine issue of material fact. *PPM Fin., Inc. v. Norandal USA, Inc.*, __ F.3d __, 2004 WL 2904313, at *4 (7th Cir. Dec. 16, 2004). McIntyre has presented no competent evidence—either properly through his Local Rule 56.1 statement of facts or improperly through his response brief—that casts doubt on H.B.'s facts showing that it is located in Nevada. McIntyre has not argued that Household International, Inc. is an inter-changeable corporate entity with H.B. Nor has McIntyre introduced any evidence to raise any genuine issue of fact as to whether the alleged deceptive acts or practices took place in Illinois. As a result, we find that the Illinois Consumer Fraud Act does not apply to McIntyre as a non-Illinois consumer suing a Nevada defendant. *See, e.g., Hastings*, 984 F. Supp. at 615. Accordingly, we grant H.B.'s motion for summary judgment as to Count Two.

## III.    Count Three: Unjust Enrichment

H.B. is also entitled to summary judgment on McIntyre's unjust enrichment claim.

McIntyre's claim for unjust enrichment is based on his allegation that H.B. improperly collected money on his account by selling the unpaid account to a collection agency. (R. 34, Am. Compl. ¶¶ 47-50; R. 57, Pl.'s Summ. J. Resp. at 14-15.) As H.B. argues, however, unjust enrichment is a doctrine of quasi-contract that only applies to parties that do not have a contractual relationship. *First Commodity Traders, Inc. v. Heinhold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir. 1985); *see also* 66 Am. Jur. 2d Restitution & Implied Contracts § 24 (2004) (stating that "an action for unjust enrichment cannot lie in the face of an express contract"). We have previously held that McIntyre's submitted application constituted a contractual offer and H.B. accepted the offer by approving his application and mailing him the credit card and Cardholder Agreement, thereby establishing a contract. *See McIntyre*, 216 F. Supp. 2d at 722.

McIntyre's statement that the arbitrator in this case determined that "no contractual basis existed for the charges in the first place" misrepresents the arbitrator's findings (and is unsupported by any citation). (R. 57, Pl.'s Summ. J. Resp. at 15.) The arbitrator found that McIntyre's claims were not arbitrable because the terms of the Cardholder Agreement did not go into effect based on McIntyre's non-use of the card. (R. 59, Pl.'s Exs., Ex. G, Arbitration Award at 10.) This decision had no bearing on our previous finding that a binding contract existed between McIntyre and H.B. from the time H.B. accepted McIntyre's application. *McIntyre*, 216 F. Supp. 2d at 722. The offer that H.B. extended to McIntyre included the disclosure that the $79 fee would be applied to his account on the date that the account was opened. As we previously held, McIntyre accepted that offer by sending in his application. Thus, McIntyre formed a contract with H.B. that governs any dispute over the annual fee, precluding his claim for unjust enrichment. H.B. is therefore entitled to summary judgment on Count Three as well.

## CONCLUSION

After carefully considering the arguments and evidence submitted by the parties, we deny McIntyre's motion for class certification, (R. 37-1), and we partially grant and partially deny H.B.'s motion for summary judgment, (R. 47-1). Specifically, H.B.'s motion for summary judgment is granted as to paragraphs 34-36 and 41-42 of Count One of the first amended complaint, and as to Counts Two and Three in their entirety. H.B.'s motion for summary judgment is denied as to paragraphs 37-40 of the first amended complaint, which claim TILA violations based on H.B.'s alleged failure to send periodic statements. The Clerk of the Court is instructed, pursuant to Federal Rule of Civil Procedure 54(b), to enter partial judgment in favor of Defendant Household Bank and against Plaintiff David McIntyre.

Since the scope of this lawsuit has been substantially narrowed, the Court does not see any need to alter the current trial date of January 18, 2005 which was set on August 3, 2004. The parties are urged to exhaust all remaining settlement possibilities for this lawsuit. A status hearing will be held in open court on January 5, 2005 at 10:00 a.m. unless this Court is notified by the parties that this matter has been settled.

ENTERED:

**Judge Ruben Castillo**
**United States District Court**

Dated: December 21, 2004